First matter listed is Advanced Disposal Services, East Inc. v. NLRB. Mr. Barker. Good morning. May it please the court. My name is Daniel Barker. I'm from the law firm of Jackson-Lewis PC. I'm representing Petitioner Advanced Disposal Services in this matter. I'd like to reserve, if I could, three minutes of my time for rebuttal this morning. Granted. Thank you. We propose first to turn this morning to the issues concerning the Regional Directors' Authority. Please, the court. Yes, if you could get a little closer to the microphone, please, and speak directly. I'm having a little difficulty. Certainly. I'd like to turn this morning to the issues concerning the Regional Directors' Authority. At the outset... I'm sorry. I didn't even hear the last word. The Regional Directors... The Regional Directors' Authority. Authority. At the outset, the one thing that I'd like to point out to the court is that at no time in this case did anyone with any lawful authority supervise or conduct an election at Advanced Disposal Services. In fact, what we've got here is it does not appear that the Board is disputing the Regional... Wasn't Mr. Walsh's authority ratified? That's the NLRB's claim, and the ratification claim here is based on common law agency doctrine. That's ratification. It really comes out of the common law of agency. Right. Well, regardless of its provenance, as Judge Slobodur has asked, why don't we have a clear example of ratification here by the officer of the NLRB? Yes. And so... We have a document demonstrating that he has reaffirmed, if you will, the previous decision, do we not? Your Honor, we do have an attempt, and what I think the common law of... I didn't ask how you characterize it. I asked if we have a document. We do have a document signed by him, do we not? We do have a document in which Mr. Walsh ratifies his decision. The question is, does that document have any legal effect? And what the Supreme Court directed us to do in NRA Political Victory Fund is to look at the common law of agency. And in NRA, the Supreme Court said there are times in which post hoc ratification cannot occur. And that is one of the... In this case, we have one of those situations. Why can't it occur here? It cannot occur because we look to the restatements of agency for the three times in which ratification cannot occur. And two of those situations are actually present in this case. First of all, the restatements say that a principal cannot withdraw an agent's authority after an objection... I'm sorry, they cannot ratify an agent's authority after an objection has been made. That's very clear in the restatements. It's been the law under the restatements for over 50 years. Take your pick, restatement second version, restatement third version. That's still the law, or at least it's still the position of the restatement. All right, granting you that, and I know I'm interrupting you, but shouldn't we begin as a matter of appropriate analysis here with the presumption of regularity with respect to our view of the document I asked you about, and then look to why, in your view, that presumption is overcome? I'm certainly fine with starting with that presumption of regularity. Fine or not excited about it, whatever your reaction is, is it the correct way to proceed analytically? I think that's fine. It is the correct way to concede that. And then we start with the presumption, and then the question is, has the presumption been rebutted? And there's a couple of reasons. As I've pointed out, the objection that we made here came before, the day before, the ratification by the NRB and three weeks before the ratification by Regional Director Walsh. And what the restatement says about the reason behind the rule for why you cannot ratify after an objection has been made is what the restatement says, and I'm looking at the comments to the third restatement, is that it is an incentive, provides an incentive for the principal to ratify earlier and sooner rather than later. So who's the principal and who's the agent here? The principal would be the National Labor Relations Board, and the agent would be Regional Director Walsh. Are you sure about that? It seemed to me that the board is acting on its own behalf, and Walsh is acting on his own behalf. I'm not clear that we have a principal-agent relationship here. What the National Labor Relations Act says, it starts out with the presumption, or it starts out with the premise that it is the board that conducts elections. And I believe it's in Section 3 of the Act, either 3 or 4, which says that the board may delegate to the Regional Directors the ability to conduct those elections. So this really is a delegation of authority by the board. In our view, the Regional Directors. Is a delegation the equivalent of a principal-agent relationship? It would seem to me that it is, especially here because it seems that the board views that as a principal-agent relationship because that's where the doctrine of ratification really comes from. It comes out of agency law, and they have suggested no other principle or source of law to allow us to evaluate the effect of that ratification. How is your client prejudiced? I'm glad you asked that question. I'm sad you're not. We're all very happy here in case you haven't noticed. The client was prejudiced because the principles of agency law, they say we look at a ratification, we look at the attempted ratification, as of the date of the ratification. And so had this act occurred, had the election occurred on the date of the ratification, we would have had a different electorate. There's turnover amongst employees between April of 2014... So what? Is there anything in the record factually, or that can factually demonstrate that turnover? And a turnover which, to answer Jay Sloan's question, prejudiced you in some way. I mean, there is turnover that goes on in any workplace over a period of time, constantly. You're not suggesting that turnover that occurs after a close election such as this one somehow delegitimizes the certification of the union, are you? What we're suggesting is that turnover after an election that has been conducted without legal authority does delegitimize or does affect the outcome of that election. Because the restatement looks at, and this is the second principle of the restatement, I think it's section 89, is had the ratification been made, or it says, as of the time of the attempted ratification, has there been a material change in circumstances between the parties? And yes, in this situation the prejudice is that there was turnover in, and I'll address your question about whether there's evidence showing that, was there turnover, and have the views of the electorate, have they changed in an election situation? These things occur very dynamically. This was a one-vote election. But we have no idea. We have no idea whether the turnover would have added more voters in favor of the bargaining unit or opposed. The record is devoid on that, is it not? The record is devoid as to whether anybody would have changed their vote. But I would posit that the employer, had it had more time, had it had three months extra, maybe we could have changed votes, and that's what the restatement is getting at. Maybe it would have gone the other way. It could have gone as far the other way. We can't speculate. We can't, and that's why we have elections. And in fact, what the NLRB is... But the election came out the other way. It didn't come out your way. It did not. It did not, and we think that we should be given the chance to have an election with the property. Let's get to that because, and I don't mean to shortcut either of my colleagues who can certainly address questions, even if we're beyond the clock, but because you have a limited amount of time, I assume you'd like to reach the merits questions here. And so why don't you speak to that? Certainly. As to the merits, we acknowledge that there's a deferential standard of review here, that the court is going to look and see. So why aren't you asking us simply to reweigh the evidence? Because hard as I try, I can't see that given that difficult standard that you concede you face, why are you not asking us to give different weight to certain pieces of evidence than were given by the finder of fact here? Yes. In this situation, what the board did not do, and this is our complaint with the board, is that it didn't conduct a fair review of the record to draw fair inferences, fair and reasonable inferences. All right, that's a generality. What are the specifics? The specific situation here is the board found that when Mr. Lyons began punching the wall in the time clock room, and he was flanked by three other union supporters, that when he began punching the wall, the board said, that's not a threat. There's no way anybody would consider that to be a threat. And the problem with the board's analysis is that there was no contextual information to suggest that it wasn't a threat. Why is it wrong? What else was there in the factual setting in which this rage occurred that suggested that the punch had any possibility of being thrown in any direction other than the wall? Was it known? Was it known? Yeah, was it well known? I thought the record was that it wasn't. So I've got two questions in front of me. Are they different? Do they come out different? What the record shows is that there was discussion amongst the employees of a fight. A fight? A fight that two guys were going to, I believe it was described as, were getting into it kind of like fighting. But they did not come to blows, right? They did not. They were friends. You dispute that, right? We dispute that they were friends, and that's one of our problems with the board, is where's the evidence of what that friendship was about? We don't know. Well, they were friends for many years. But we don't know what the character of that friendship was. Sorry, maybe it was a mild friendship, but I guess you still have... Platonic. Yeah, platonic. But you have, do you not have a problem, a classic problem of ambiguity? Namely, you may be quite right that some people would view Ryan's punching of the wall as a threat, but it's also possible that others would view it as a guy who's really upset and frustrated that his friend of whatever quality isn't joining forces with him to vote the way he would like, and that it would be rational to conclude that there was no risk that he was going to hit anybody other than the wall. And I see that my time is just about to expire if I'm going to answer. You can answer. If there were evidence in the record suggesting that this was some kind of common occurrence and there was nothing to fear from this denial... Why does it have to be a common occurrence? This is catharsis for this guy. It may not be socially acceptable catharsis, but it was catharsis, or at least a finder of fact could appropriately find that, couldn't he? They could probably find that it was catharsis, but the important point here is what's the effect of that catharsis on the other employees who either saw it or heard about it? I see that my time has expired. Thank you very much, Mr. Barker, and we'll have you back on rebuttal. Ms. Isbell, am I pronouncing that correctly? You are, thank you. May it please the court, Kelly Isbell here on behalf of the National Labor Relations Board. This court affords a presumption of regularity to the acts of government officials absent clear evidence that they acted with bias or outside the realm of their authority. It was a pretty, pretty... No, that's not a good modifier. It was a very perfunctory formal modification, wasn't it? It was, Your Honor. So what are we to make of that? Because Mr. Barker, I think, would have us make a great deal out of that. Courts don't go behind and ask how the government official reached his decision unless there is some evidence that he was biased. We don't usually know. I'm sorry, Your Honor? I say courts don't usually know how a government official reached its decision. That's true. His or her. But in this case, Regional Director Walsh was, in fact, the person who made the decision to sign off on the stipulated election agreement. Remember what we're talking about here is the union and the employer agreed to sign, we call it a contract, a stipulated election agreement, to hold the election at a certain time, a certain place, among certain people. And that's what the Regional Director approved. Not with certain effects. Not with certain effects. And a Board agent of the Region went to supervise the election. That's the action we're talking about. And Regional Director Walsh, once his appointment was ratified, considered his decisions. We don't know how much time he spent, but there's no requirement that I can find in the cases about ratification that specify any specific level of consideration or detail. Is there any different standard when the same person ratifies the conduct? Is that your argument that it's entitled to some sort of super presumption of regularity if the same person is involved rather than some replacement or different person? I don't know that I would go that far, but I think because what you have is a terse document with Walsh reconsidering his own actions. In the cases, Doolin, Legitech, Legitech is a situation where the same officials ratified their actions. Doolin is a case where different officials ratified actions. And I don't see any different kind of standard of review. It's all about whether or not they acted within the regularity of their office and acted within their authority. Now, do you concede that this is a true agency relationship? Is this a principle ratifying the previously invalid conduct of an agent, or is the principle the same? It might be the principle is the same. Why? The board ratified its own actions. Mr. Barker said the board is the principle and Walsh is the agent. Tell us why he's wrong on that. The board delegated its authority to conduct representation elections back in, I think, 1961. Regional directors do not have the authority to issue final orders in representation cases. They issue orders that can then be board reviewed. There is no instance where a regional director, without consent, so you don't have to object to a regional director's election decision, but it could become a final order if you do not, but there's no instance where without, with an objection, a regional director's election decision becomes a final order. That's the difference. The regional director can't issue the same kind of decisions the board can, right? So the board, and in this case, what he did was not something. You didn't ask us if it was right. The board did not supervise the election and did not sign the stipulated election agreement. What the board did was review ADS's objections to the election. That's the board's job. So Walsh is the principle. Walsh is the principle of its own actions. He's ratifying his own conduct. He's ratifying his own conduct, and the board ratified his appointment. That's the board's own conduct. So that being the case, should we, as a matter of law, be more inclined to application of the presumption of regularity in that he was ratifying his own actions? Does that provide greater weight to his subsequent determination? I think it is certainly easier to see how he could ratify his own actions. Well, I can't imagine he would do otherwise. And the board didn't. So flipping that, really, I mean, since we're talking about a presumption, which is really a device that implicates the order of evidentiary presentation, it's really up to ADSE here to overcome that presumption. What have they induced to do so? Nothing to my knowledge. Let me switch to a legal question here. And that is, what is the proper standard that is applied or that we should apply for later ratification of official actions? Because I'm not sure that this Court has actually held forth on that question, have we? I have not found any cases. Is there anything in answering that question, is there anything from NRA Political Victory Fund that might inform us or from either Legitech or Doolin that might inform us in that? Legitech, I think. Legitech talks in terms of the presumption, the Court's presuming absolute clearness to the contrary. It also talks about the fact that the issue is whether or not what the agency did to cure the problem, whether or not that, in fact, cured it. What was the problem? Well, the original problem was that Regional Director Walsh's appointment was made by a recess board. And after the Supreme Court's decision on Noel Canning, that appointment had to be redone. So that is the problem. But that problem... Was that redone? It was, in fact, redone. The Board ratified his appointment after Noel Canning issued in the Supreme Court. This may be out of curiosity. I guess it doesn't relate to the case. But in reviewing the briefs and studying the case, it occurred to me that this issue about the validity of the appointment, ab initio, would seem to only be meaningful in the event that during the interregnum, there's a political change in the Board. Is that right or not? Well, I mean, I guess we're just spinning things out now, right? I know that didn't happen here. The same guy got appointed. But had the Board changed, you know, then maybe Walsh gets pulled, right? Then everything changes, right? That's certainly possible. But I guess what I'm asking hypothetically is, when the Board doesn't turn over during the interregnum, this seems to be much ado about nothing because ratification will follow as night to day. The Board doesn't have an awful lot of experience with ratification. It doesn't come up very often. As you noted, Judge Smith, there aren't that many cases. But in this particular case, it did come up. But that doesn't suggest that it's invalid. Well, I mean, doesn't the presumption of regularity do the heavy lifting for you here? I mean, isn't its invocation effectively game set and match, as our dear colleague Judge Berry would say? Yes, Your Honor. I think it is, unless there's evidence that Original Director Walsh has said otherwise. Unless there's evidence. And your response to me on that question is there was no evidence. There is no evidence. May we switch to the merits, please, Ms. Isbell? Assuming, for argument purposes, that you don't prevail on ratification, you've heard your adversary's position here and you've read the brief of your adversary. What is your response to that? In particular, the first thing that Mr. Barker raised was the, one could call it a violent episode. An episode of rage. Is that problematic for you? It's problematic for us because the Board did not find that. And the Board certainly didn't find there was a fight between these two gentlemen. He certainly found that the pounding of the wall took place, right? He went on, in fact, to explain it away by saying there was no evidence of any damage to the wall. Am I correct? Correct. The hitting the wall is a matter of fact. Remember, there were managers sitting in an adjacent room who could hear this altercation and never moved. They certainly didn't think anyone was in danger. Hitting walls is not generally considered normal behavior in polite society. It might occur in certain political debates these days, but it's not occurring as far as I know in most of the circles in which I move. That's true. But you don't know the circles. Nor do you. I'm from Alabama. My circles are sometimes a little strange. These are two long-time friends who had differences of opinion about the union. You've said they're friends, and as you know, the other side has said there's no basis for that. What about that issue? Were there findings? There were findings. One of the managers testified that they'd been friends. What's the record support for? One of the managers testified that they'd been friends. Lyons testified that Shackelford was at his daughter's birth. I'm not going to track that one down. I don't know if he was in the room, but he was there. So these are two long-time friends. The board does not overturn. Remember what the standard here is. In order to overturn an election on the basis of third-party conduct, there has to be conduct that creates a general atmosphere of fear and reprisal that makes a free election impossible. We have two men both yelling at each other, evidently, according to the record, and Lyons falling away from his friend, turning away and hitting a wall. There's no indication he ever tried to strike his friend. There's no evidence that he tried to strike anyone. He was employee of the month a few months before. What about the big rig semi that was driven up to the scene and blocked at least partially ingress and egress? According to the record, the company's vehicles also blocked. The police report says both the union's vehicles and the company's vehicles partially blocked. The police asked them to move, and everybody moved. They both moved when the police asked. And both sides moved. That was very nice. Two rights make the wrong. Two wrongs make the right. They were both blocking. According to the record, that road goes nowhere. But they both pulled their vehicles out. It's fair to say, isn't it, that this election wasn't conducted according to Hoyle in all respects. This is not the model for these elections, right? I don't know. Does she know? I don't know that this is not the model. Irrespective of whether it's the model, this was a highly emotional, emotionally charged setting, wasn't it? And those emotions were fed and fueled in part by the conduct of Mr. Lyons. Mr. Lyons' conduct occurred in a room away from the voting area. While the voting was going on, right? While the voting was going on. But the people who were voting could not see him. This was not a widely disseminated incident. The spatial difference was not huge. It was not enormous, right? It's not huge. It's not enormous. But if something happens in a vacuum, how can it affect the vote? I mean, this got out. One employee testified that he heard a group of five or six people discussing a fight that was going to happen. Don't you find that interesting that others, whether or not it was accurate, and it's not accurate as far as the finer of fact is concerned here, characterized it as a fight? I mean, that further fuels the emotive nature of the setting that we're talking about. But emotions do not overturn an election. There has to be a threat. There has to be conduct that makes a free election impossible. And union elections are full of emotion. They just are. People disagree. But the fact that people are talking about disagreements does not make this. It wasn't a big disagreement. It was two people. It was two people. It was two people. One man turns away from the other and hits the wall. And evidently their fight was not emotive enough to call the managers out of the adjacent room where they were listening. Are there no further questions? Thank you. Thank you very much. Marker, you have rebuttal. Thank you, Your Honor. The question was raised about the presumption of regularity. And I think the point was, or the question was, isn't this game set and match? That was the question. It's not. If it were game set and match, NRA, our political victory fund, would have come out differently. Because in that situation, in that case, there was an attempted post hoc, out-of-time ratification of a petition for sociology. And the Supreme Court said, no, timing matters when it comes to ratification. And the Supreme Court said, we're going to look to the restatement of agency and the principles stated therein to determine whether a ratification should be given legal effect. And to that end, the other question that came up was, what's the prejudice to the company? And if you look at it from a prejudicial or from a prejudice standpoint, reference to the D.C. Circuit Court's opinion in S.W., I believe it was S.W. General, the D.C. Circuit Court said the showing of prejudice or the burden of prejudice is not particularly onerous. And that's in the S.W. General case. What was that word? Onerous. Onerous. Onerous. And in that case, the prejudice that was shown was, in the case involved, the authority of an invalidly appointed NLRB general counsel to issue charges. And the prejudice in that case was determined that a different general counsel might have looked at the charging decision differently. So the D.C. Circuit made it very clear that it's not particularly onerous. And the D.C. Circuit also said that in cases where the problem is structural, prejudice is not even required. So the D.C. Circuit took it from two different directions and said, number one, it's not required, and number two, if it was, it's not particularly onerous. I'd like to speak to the friends issue real quickly. I heard counsel say that Mr. Shackelford was there at the birth of Mr. Lyons' child. Well, the hearing officer found Mr. Lyons' adhering not to be credible, so we don't know what the credibility determination was on that. But I think what's more important is, if you look at the record on pages 200 and 201, Mr. Lyons did not even know Mr. Shackelford's last name. He didn't know his last name. So how the board can come in and characterize these two guys as friends for a long time without any real evidence when Mr. Lyons didn't even know his last name? Are you saying they weren't friends for a long time? Are you disputing that fact? Well, it really depends on what the definition of friendship is. All right. If it does, would it be accurate to have characterized them as acquaintances for a long period of time? I think you could characterize them as acquaintances, and then the point doesn't have as much force. Isn't the record saying 20 years or something? They know each other for 20 years, but I've known people for 20 years. Am I making that up?  That's in the record. I think there are some that go back less than 20 years, but it's a long time. Thank you very much. Thank you. Thank you, Mr. Barker. Thank you, Ms. Isbell. The case was well argued. We'll take it under advice.